Our first case is 19-2092 United States v. Sanchez, and Ms. Katz is for the appellant. You may proceed when you are ready. Good morning. My name is Margaret Katz. I'm the federal defender for the District of New Mexico, and I'm representing the appellant Mr. Sanchez. From the moment that the officers confronted Mr. Sanchez, he was detained. They abruptly converged upon him, and they boxed him in between two cars. There were two cars that were parked close together, and one officer stood on one side, the other officer stood on the other side. And then one officer closed the car door that Mr. Sanchez had had open without asking his permission and also then cutting off his light. Ms. Katz, how do you reconcile your argument that he was detained from the outset with page seven of your motion to suppress that says, in the incident case, officers first seized Mr. Sanchez when they ordered him to put his hands on his head so they could pat him down. At that point, all officers knew was that Mr. Sanchez was between two cars. He was actually not asked to submit to a pat-down until after he had fled Officer Brown and Officer Cordova. He was, they wanted him to submit to a pat-down before he fled, but just to back up, they needed reasonable, articulable, reasonable suspicion from the moment that they approached him and they didn't have that. And that's why we're saying he was detained immediately because he wasn't free to leave at that point. He wasn't free to go about his business. He wasn't free to ignore their presence or their order to put down his box, his toolbox. So at that moment, the officers needed articulable, reasonable suspicion that crime was afoot and they didn't have that. You can say he wasn't free. I mean, even later, he actually fled. So he felt free to flee. And in train cases, I think we have, I don't know how we have ruled when people's exits have been blocked, but there on the train, you're really stuck on the train. Here, he really was able to flee and leave until, of course, they captured him, tackled him. He was clearly under arrest then. Your Honor, your point of analysis, the court's point of analysis is at the moment that there becomes a detention and that detention happened as soon as they boxed him in, they closed the door, they told him to put down his toolbox. The fact that eventually he was able to get around one of them does not mean that he wasn't detained. We have to look at the factors. If we look at the factors that this court has set out in several cases, including Spence and Lopez and Hernandez, the factors to determine whether a particular encounter is a consensual encounter or is it a investigative detention. And the factors, if we look at those factors and we have to look at those factors from the moment of the encounter starts, there has to be reasonable suspicion if there's an investigative detention, there has to be reasonable suspicion from the moment the detention begins, unless it's a content, unless it's a consensual encounter. Why wasn't there reasonable suspicion for an investigative detention from the inception given the history of burglaries at this hotel, the suspicious behavior of your client, the toolkit, the license plate mismatched? Why wouldn't this just be more or less a classic Terry stop? So the officers needed reasonable suspicion that crime was afoot. So the question is, what crime did they think was afoot? They suggested that perhaps the vehicle was stolen, perhaps the plate was stolen. But Officer Brown, before they approached Officer Brown, knew that neither the vehicle nor the plate were stolen. How did he know that when he's not able to to get the full VIN at that point when he was only able to look at the first four numbers? So how would he have been able to determine whether or not the Hyundai had been stolen or if he hadn't had all of the VIN number? Your Honor, he got the last four numbers of the VIN and he called that into dispatch and they're able to check from the last four numbers of the VIN vehicles that have been reported stolen. And that vehicle had not been with that VIN number, had not been reported stolen. And he knew that he wanted to go in and get the full VIN. But he got the last four of the VIN and he got the license plate and called dispatch and they were able to determine the vehicle was not stolen. And the plate had been stolen, but the license plate had been stolen. There was no evidence the license plate had been stolen. The only evidence, the only issue was the plate didn't match the car. Then I'm asking you, ultimately, it was determined that the plate was stolen, correct? That was that was not part of the hearing or part of the issues at the suppression hearing. There was no evidence that was submitted. So I would submit it's not relevant whether it eventually. But the officers, what Officer Brown specifically knew was that the vehicle was not stolen and neither was the license plate. And if I can just go back to finishing answering Judge Simkovich's question, so what was the reasonable suspicion that crime was afoot? It was not that the vehicle was stolen because that was clearly dispelled. The other the other issue that was intimated or concern that was intimated was Sanchez going to or was he in the process of stealing the vehicle? But both officers watched him for 10 minutes and saw absolutely nothing that indicated that he was stealing the vehicle in the process of stealing the vehicle. And in fact, when they did approach him and box him in, they saw right away that there was that the vehicle had not been breached. They had said that they were concerned that the locks were popped, but there was absolutely they saw right away that there was the vehicle was intact. The window was intact. The lock was intact. So there was no reasonable suspicion that crime was afoot. I mean, there's a reason why it's called reasonable suspicion and not just suspicion. This court has said over and over again that inchoate suspicions and unparticularized hunches are not enough to stop somebody and detain them and restrain their freedom of movement. Moving on to going through some of the factors in determining whether there is a in fact a investigative detention or whether there's a consensual encounter. This court has laid out factors. A number of those factors are the location. Is it open to the public? Is it in view of others? Whether the police officer touched or in any way physically restrained the person or restrained the person's movement, whether the officers were in uniform, whether they had weapons, how many officers there were, the demeanor, the tone of voice and whether the officers advised the individual, in this case, Mr. Sanchez, that he was free to leave, that he was free to ignore their requests. And all those factors fall in favor of finding that there was investigative detention, that it was not a consensual encounter. The location was not out in the open. There were not other people around. The officers physically restrained Mr. Sanchez, not by touching him, but by closing his door and getting taking away his light and by ordering him to put down his toolbox. Now, Officer Brown testified that he did say that I told him to put down his toolbox. And then on cross-examination, he said that he had asked him, the question was, you asked him to put the toolbox down, correct? And the answer was yes. And so then the district judge found that he had asked him to put the toolbox down, not had ordered him to. In light of the fact that we have a district court finding and that there was testimony both that he told him and that he had asked him, shouldn't we, viewing the evidence in the light most favorable to the ruling, conclude that he had asked him, not ordered him? If a factual finding is clearly erroneous, then this court should disregard it. And clearly he, I think all the first of all, the totality of the circumstances would indicate that he ordered him to put the toolbox down. And even his testimony never indicated that he requested that he did. I mean, it's important to look at the language when they say put the toolbox down. They didn't say, would you mind putting the toolbox down while we talk? In fact, none of their language was language of a consensual encounter. Would you mind answering a few questions? Can we, if they were legitimately concerned that he was trying to steal the car or they were legitimately concerned about the mismatch between the plate and the car, those were the questions they could have asked to either confirm or dispel their whatever suspicion they had. But they didn't do that right off the bat. They said, put your toolbox down. What are you doing with this car? Those in the context of all the factors, he was absolutely ordered to put down his toolbox. Additionally, they're asking a question about the New Mexico flight statute. And as I understand your argument is that there was never a reasonable suspicion for the seizure. Therefore, the statute simply does not apply to is that the gist of your argument? Yes, your honor. Like as in Romero versus story, same thing. Unless there's reasonable suspicion to believe that somebody has committed a crime prior to the flight, the flight itself is not a crime. You can't evade where there wasn't the reasonable suspicion. And for your argument, we can't look at whether additional suspicions were developed during the questioning because reaching his hands in the trench coat, the shiftiness of it, the lie he took, the lie he told them that was already that was too late because he'd already been seized with reasonable suspicion. Right. Yes, your honor. It's too late. And plus some I just just to quickly address some of the factors that you mentioned, for example, hands in the pocket. This court specifically ruled in Davis where in Davis, same thing, cold December night. Mr. Davis put his hands in his pocket. Same thing here, cold November night in Albuquerque, hands in the pocket. And there were no other indicators that the individual was armed and dangerous, as in there were no bulges. There were no furtive movements. There were no. It wasn't their testimony that he he instead of just putting his hands in the pockets, didn't didn't they say that he was fidgeting or moving his hands or there was some word they use? I've forgotten what it was that suggests that it was kind of searching to get into the pocket rather than just putting them in the pocket. Your honor, I would disagree with that description that that is not I don't believe that is the description. I believe they just said he put his hand in. In his pocket later on, maybe what you're referring to, your honor, is they say when he's running, when they chase him, causing his coat to come off, they say that he it seemed like he was trying to reach into his pocket at that time. If I may, I would like to reserve the rest of my time for rebuttal. Thank you, counsel. Let's hear from the government, Mr. McNair, whenever you're ready. Morning, my name is Chris McNair, I'm with the United States Attorney's Office in the Las Cruces branch office. May it please the court and counsel, I'd like to begin before discussing either the consensual encounter or reasonable suspicion just by clearing up a few things in the record, because I noticed that the court had a few questions on that. And I think that I may be able to clear things up a little bit. First of all, on the boxing in issue, officer, both officers testified that they had no point boxed the defendant in between the two cars. The district court's finding on this point was that the officers announced themselves as they got close to the defendant. We don't know exactly where officer Cordova was whenever officer Brown initiated the encounter with him, but it supports officer, both officers testimony that he wasn't boxed in because he fled in the direction that officer Cordova would have had to have been standing on the other end of the two cars in order to box him in. So the fact that he was able to flee towards the front of the Hyundai and then double back and go into the parking lot of the hotel is indicative that he was not, in fact, boxed in between the two cars. Judge Bacharach, you brought up the argument in the motion to suppress, which was that he was first seized the moment that he was asked to submit to the pat down. Um, that's correct, that that was the defendant's argument from the very beginning in this case. And in fact, after the hearing, the court requested supplemental briefing on a few issues. And at that point in time, even after these facts regarding the toolbox were were brought out at the hearing, the facts regarding the door being shut, the defendant argued in supplemental briefing again that he was first detained the moment the officers asked him to submit to the pat down. It was the United States who argued whenever in the response to the motion to suppress that, hold on, there's actually these questions that occurred before the request for the pat down that occurred within the context of a consensual encounter. And defendant's response to that in the reply brief to the motion to suppress was, well, there's no way that you can construe a request to be pat down as a consensual encounter and disregards the other questions that were asked in the reply brief, which was largely the non issue for the court until we got to the appeal here. And that, in my opinion, the district court generously interpreted the defendant's arguments and even construing the defendant's arguments regarding the consensual encounter in its opinion. Mayor, can I ask you about that? Because I just want to make sure that I understand what you just said. So, as I understand, Ms. Cates' argument is in the motion to suppress, when she makes that reference on pages seven and eight, she's referring to right at about the same time that he asks, Officer Brandt asks or tells him to put the toolbox down. She's saying that he was ordered to submit to a pat down. And she's saying from the get go, from that point on, there was a seizure. And that's what she was arguing in her motion to suppress. And she argues in her on appeal that the government never argued reasonable suspicion in district court and had an opportunity to do that, which seems right if she had argued that in the motion to suppress and you didn't argue reasonable suspicion at that initial, at the point of the initial encounter. So if that's correct, why didn't you waive an argument that there was reasonable suspicion at the point of the initial encounter? Your Honor, the government was, as I, as I argued, the government is the one that brought up the factor or the initial questioning between the officers and Sanchez in responding that, hold on, before we get to this request for a pat down, there's other things that occurred. And so the government argued that that occurred within the confines of a consensual encounter. The government did make a reasonable suspicion argument in its response to the the government incorporated questions that occurred before the officers approached or sorry, facts that occurred before the officers approached and then facts that occurred after the officers encountered the defendant, that the government did not delineate the exact moment that the officers had reasonable suspicion, but the government did argue that there was reasonable suspicion when they, um, during the encounter. It just later on, correct. And at the point that he's tased in the light. Well, the, the government, what the district court concluded and what the government I think was arguing was that reasonable suspicion developed throughout the encounter. Once he, um, once he admitted that he had a connection to this vehicle that the officers believe was stolen. And once, uh, he lied about showing up in the Lexus, which the officers had observed. And so both the government and the district court, I think determined that reasonable suspicion developed around that point in time. Um, but to the point of waiver, um, you know, this court has repeatedly held that it can affirm a lower court's ruling on any grounds adequately supported by the record. And the record was sufficiently developed here for this court to determine that there was reasonable suspicion from the outset, um, of the encounter. Except the reasonable suspicion was based on the fact that this was a suspicious location where stolen vehicles were taken. He denied showing up, uh, in the, uh, in the Lexus, uh, and he was hunkered down with his toolbox for some period of time doing an undefined thing. That's never been completely clear. Those three things you think supported the reasonable suspicion. If we're talking about reasonable suspicion from the outset of the encounter, I would, that would be different facts. Those facts would be that the, uh, that officer Brown, when he determined that the license plate did not match that car, um, I don't want to clarify, clarify one point, uh, officer Brown undoubtedly did not know that this car had not been reported stolen when they approached. If the court looks at the record at page 1 23 and 2 0 9, officer Brown testified that the moment before they approached, made the approach, he was investigating that as a stolen vehicle due to the mismatch license plate. And then he also rejected the idea that dispatch had ever told him that this car had not been reported stolen. The district court actually got the facts a bit confused. And I think I did too. And my facts, he did not call in the VIN number, the last four digits of the VIN for the car, for the Hyundai. What he actually called in was, or he asked for the last four of the VIN that was associated with the mismatch license plate, he was standing at the car and looking through the window. And that's in his testimony that he's actually looking at those four determines that they don't match the number that he got from dispatch doesn't match, and then he returns to his car, asked for backup and he's going to re-approach, um, and so that's supported by the district court's, uh, determination that he not only was going in for the approach to, um, talk to Sanchez, but he was also going in so that he could get the full VIN in order to find out information regarding that vehicle. Ultimately, and there was some confusion on this point, the license plate, he did know when he approached that the license plate had not been reported stolen, dispatch had not, or at the least dispatch had not told him that the license plate had been reported stolen. Um, however, the car ultimately in Kander again, the car had been, not been determined to be stolen whenever they, uh, finally wrapped everything up. The Lexus was stolen. The Hyundai wasn't, however, the Hyundai wasn't registered to defendant or his girlfriend. And so I don't think that there's any evidence in the record about how they came into possession of the Hyundai, but just to clear up that point, when he approached, he did not, he knew that the license plate had not been reported stolen, he did not know whether or not the Hyundai had been reported stolen. And he was approaching to investigate that as a stolen vehicle, but at the same time, back to, uh, the point I was trying to make there a little bit ago, um, when he approached, he, whenever they saw Sanchez crouch down and there's testimony that he's crouched down facing the Hyundai, he also testified that he believed that Sanchez was about to punch the locks. Um, now there's some tests or there was some argument that they had been sitting there for 10 minutes. That comes from officer Cordova's testimony. And it's unclear from his testimony when he's running that 10 minute calculation from, so he shows up on scene before Sanchez ever gets there and he, he thinks it was about two minutes and then he testifies, well, I think it was about 10 minutes that I sat there before we approached, but he's not, it's not sure if he's, if that's from when he showed up on scene and it's not, if, or if it's from when, um, Sanchez showed up on the scene, but then also we don't know how long, there's no context for how long Sanchez himself stayed in the vehicle. So we don't know how long the officers were sitting there watching Sanchez at the vehicle when they decided to approach, but back to reasonable suspicion from the outset, um, what we have is that the officer knew that the, there was a mismatch license plate. He watched the defendant pull a toolbox out back in a lone individual pull into this parking lot, put a toolbox down by the driver's side door of that vehicle, and he believed that he was about to tamper with that. And under, um, the court's decision in Shelton, which was, uh, one of judge Timkovich's cases, and I believe joined by judge Bacarach, there's reasonable suspicion for them to approach and determine whether there's a car burglary or an auto theft that's occurring. Um, that's similar also to the Santiago case in which, uh, officers were staking out a stolen vehicle. And they, uh, witnessed the defendant suspiciously walking down the street. He then sat down next to the vehicle for practically two minutes. And there, the court found that he was associating himself, uh, with the vehicle and that there was reasonable suspicion to approach him on that. And it's also similar to the Salazar case where the district or where the court found reasonable suspicion based off the fact that a defendant pulled into a parking lot, backed his car up next to a commercial vehicle, and the officer didn't even see him get out of the vehicle, but he saw the door open. And the court said that there was sufficient time for the, when the door was open, the officer observed enough time for that person to have taken things out of that commercial truck. And so there was reasonable suspicion then to approach. What was the justification for the pat down? The justification for the pat down was the officers had observed the, uh, defendant crouching down by a toolbox. They couldn't see his body. They approached, they believe that he is in fact, uh, committing a crime at that time, or possibly about to tamper with the vehicle. They approach, they talked to him. And what officer Cordova testified to was that Sanchez's body language, he could see that he was getting into fight or flight mode, and they're not really sure which, and given the fact that he had put his hand in the right pocket, which is where the gun was ultimately found, although the officers didn't know that it was there at the time, the officers were concerned for their safety. They were still investigating these other issues. They hadn't, no reasonable suspicion had been dispelled based off of Sanchez's answers to their questions. And before continuing on with that investigatory detention, they wanted to do a pat down before proceeding. Well, they have to have the reasonable suspicion that he's both armed and dangerous. That's correct, your honor. And, uh, in reviewing, um, your decision and, or it's a dissent actually, in the Romero case, you talk about that you can't look at those reasonable suspicion, armed and dangerous in a vacuum, that all of those things play off of each other. And if an individual is crouched down by a toolbox and that they reasonably suspect him of being in the process of committing a crime, um, there may be cause to perform a pat down in that, in that instance. And that those things play off of each other. But ultimately my argument is that it's immaterial whether there was reasonable suspicion because for the pat down, because Sanchez never, um, submitted to, never submitted to that, that order when he fled through the, uh, through the cars, you know, the, the New Mexico statute, I, um, you know, your reasoning is that if an individual, um, flees, um, you know, during, during the course of a legitimate Terry stop, that that's, um, an obstruction of the investigation, correct? That's correct. I believe so. If I understood the court's question correctly, if the court determines that there wasn't reasonable suspicion from the outset of the encounter, there was certainly reasonable suspicion. Once, uh, the defendant denied any association with Alexis. And once he, um, admitted a link to the car that the, that the officers reasonably believed was stolen at that time, there's certainly reasonable suspicion at that point. And that's what the district court concluded. That reasonable suspicion was not dispelled by the time that Sanchez fled. And so regardless of whether there was reasonable suspicion for a pat down, he had reasonable suspicion and that's enough, that's sufficient under Romero the story and that statute, um, for probable cause, did they need to come up with independent justification for the pat down and we have Terry stops. And then we say, yeah, occasionally on a Terry stop, you can do a pat down when you have a reasonable belief that the person is armed and dangerous. What evidence did they have? Not that he was just trying to steal the car. That's a little different than a drug activity where we say that guns are kind of a part of drug activities. Often. What evidence did they have that he was armed and dangerous? Your honor, I understand that I'm getting low on time here, but if I can answer that question, the officers that observed him crouched over with a toolbox, which. You know, they asked him that they set it to set it down for officer safety reasons, he could have had a screwdriver. He could have had a hammer out of that. They didn't know specifically that it was a firearm. Yeah. But that is the padding down his coat. So anything in the toolbox isn't, that's not responsive to my question. Why, what evidence did they have that he might be armed and dangerous for which a pat down could help alleviate that reasonable concern? My point regarding the toolbox is that if he had pulled a tool out and they hadn't seen it, he could have put it into his coat pocket and that could have been used against them. They were, they were incredibly close together. It was approximately five to six feet apart. Um, but then when he kept making furtive gestures towards that pocket, the right pockets specifically, which is what the officers testified, um, they became concerned and when he started getting flighty, as far as officer court of his testimony that he was, um, getting into fight or flight mode by his body language, the officers were concerned and rightfully so, because he ultimately I don't see a connection between flightiness and armed and dangerous flightiness suggest not dangerous. That is, he's going to leave, but he's not going to try to create danger to the officers. So that's my problem is, is what about armed and dangerous was obtained by them that caused them to want to pat him down? I understand your honor. And the district court's findings on that point was that he kept moving his hand towards that pocket. Um, and given that he was previously possibly engaged in, in, uh, criminal behavior, that that gave the officers reasonable suspicion. My contention ultimately is that that's immaterial because he was still lawfully detained pursuant to the reasonable suspicion developed by the officers encounter with him. Thank you. Counsel, your time expired. Thank you. We have some rebuttal time. Thank you. The, the government keeps referring to what the officers believed and what that's a hunch. That is exactly what this court talked about in Fernandez. When they, when the officer talked about a sixth sense and tension in the air, there was absolutely no articulable objective specific, uh, elements that the, that, that the government can point to that the, uh, officers testified to the fact that they watch the car for 10 minutes and the government can try to move away from that 10 minutes. But that is exactly what their agent officers testified to. They watched him for 10 minutes and saw nothing that showed he was breaking into the vehicle at all. And then they, if anything, their concern that he was breaking into the vehicle should have been dispelled at that moment. And that was not the case. They said that they were afraid he was going to punch the locks, but that's not reasonable. They can't just give you a list of crimes that, that they have these happening because basically all that is, is this inchoate hunch of basically saying, uh, I have a sixth sense and I have a sense that something is wrong. Um, I also wanted to respond to the fact that, um, the government said several times that the officers. That reasonable suspicion developed during the encounter. That's not when reasonable suspicion needs to exist. Reasonable suspicion needs to exist at the moment that the encounter begins. And that's what they didn't have. And then if I could just, um, move to, um, the questions about the separate there, so there needs to be reasonable, articulable suspicion for the detention period, then separately in order to do a pat down, there has to be reasonable, articulable suspicion that the person is both armed and dangerous. And there was not testimony that there were any furtive movements, that there was a bolt, that there was anything. And that what he, that the testimony was that he put his hand in his pocket. That toolbox was closed. It was in his hand. So if anything, whatever he was doing, which we have to assume was legitimate because there's no other evidence, he was done with that, with the toolbox. And the pat down never happened. Does it, does it really matter? Does it matter that there wasn't reasonable suspicion for the pat down? If there was no pat down, there was no pat down at that juncture. Well, no, but, but, but they had to. So again, it's the same thing. We can't look at in the same vein that whether either vehicle was stolen, whether a plate was stolen, that's irrelevant. And the court should even be looking at it. And the fact that the government was telling you what happened with the car, that that's irrelevant. And it's the same exact question. As far as the pat down, it's irrelevant whether he runs because they need the reasonable articulable suspicion that he's armed and dangerous at the moment that they say they're going to pat him down, they didn't have that suspicion that would have allowed. You think the, the critical thing is asking for the pat down was unauthorized. And you, you would say that's the event when you ask for the pat down, not when you have a pat down. Yes, sir. I see my time is out. May I answer your question? Yes. So they, they said that they were going to pat him down. And at that moment they needed reasonable suspicion to do that. They didn't say, Hey, my question, my question is you yours and you just say yes or no, but it is the reasonable suspicion has to be in your opinion. When you first ask for a pat down later when the pat down occurs. Yes, exactly. That's all I needed. Thank you. Okay. Thank you. Thank you, counsel. Your time's expired. We appreciate the focus on the record in this case. You are excused and the case shall be submitted.